IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANNIECE HUDSPETH o/b/o J.T.H,    )
                                 )
            Plaintiff,           )
                                 )
    v.                           )        CIVIL ACTION NO. 1:09CV181-SRW
                                 )                   (WO)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
            Defendant.           )

## MEMORANDUM OF OPINION

Anniece Hudspeth o/b/o J.T.H.[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her daughter's application for Supplemental Security Income

under the Social Security Act.  The parties have consented to entry of final judgment by the

Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs

submitted by the parties, the court concludes that the decision of the Commissioner is due

to be affirmed.

## BACKGROUND

On August 24, 2006 (protective filing date), plaintiff filed an application for

Supplemental Security Income (SSI), alleging disability since August 24, 2006 due to

---

[1]  The court refers to J.T.H. as the "plaintiff" in this memorandum of opinion.

"[m]ental problem, ADHD." (See R. 129).[2]  On July 24, 2008, after the claim was denied

initially, an ALJ conducted an administrative hearing. (R. 22-36). The ALJ rendered a

decision on September 30, 2008, in which he found that plaintiff has not been disabled, as

defined in the Social Security Act, since August 24, 2006, the date her SSI application was

filed.[3] (R. 9-21). On January 6, 2009, the Appeals Council denied plaintiff's request for

review. (R. 1-3).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a

preponderance.  It is such relevant evidence as a reasonable person would accept as adequate

to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

Factual findings that are supported by substantial evidence must be upheld by the court.  See

Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence

---

[2] Plaintiff's previous applications for supplemental security income were denied on February 3, 2000 and October 28, 2005.  (R. 37-39, 114, 116).

[3] Plaintiff was born on November 17, 1991 and, thus, she was an adolescent during the time that the present application was pending before the Commissioner.  See 20 C.F.R. § 416.926a (adolescent age range from "age 12 to attainment of age 18").

preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence.").  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Analysis of Childhood Disability Claims

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278  (citing 20 C.F.R. §§ 416.911(b), 416.924(d).)  This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.).

As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings. In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
>  (v) Caring for [one]self; and
>
> (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[4]

Additionally, a child is not disabled within the meaning of the Social Security Act unless the impairment or combination of impairments which meets, medically equals or functionally equals the listings either has lasted or can be expected to last for a continuous period of twelve months or to result in death. 42 U.S.C.A. § 1382c(a)(3)(C)(i)("An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); 20 C.F.R. § 416.924 ("If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings. If you have such an impairment(s), and it meets the duration requirement,

---

[4] " 'A 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed.Appx. 171, 174 (11th Cir. 2005) (unpublished) (citing 20 C.F.R § 416.926a(e)(2)(I)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. § 416.926a(e)(3)(I)).

we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled."); Cf. Barnhart v. Walton, 535 U.S. 212 (2002)(upholding, in the adult disability context, the Commissioner's regulatory interpretation that it is the inability to engage in substantial gainful activity, rather than the impairment(s), which must meet the 12 month duration requirement).

### The Evidence[5]

In December 1997, when plaintiff was six years old, her pediatrician referred her to Robert Nolan, Ph.D., for an ADHD evaluation.  On December 30, 1997, Dr. Nolan evaluated the plaintiff and diagnosed attention deficit disorder; he also noted some elements of oppositional defiant disorder.  He retested plaintiff a week later, after she had started taking Ritalin, and found her to be "notably improved."  (Exhibit 1F).  In September 2004, when plaintiff was twelve years old, plaintiff's mother complained to Dr. Sam West of plaintiff's increased behavior problems and told him that plaintiff had been "hearing voices" for a year; she also told him of a family history of schizophrenia.  Dr. West diagnosed psychotic disorder, not otherwise specified, and disruptive behavior disorder (see DSM-IV-TR, pp. 861, 864 for diagnostic codes 298.9 and 312.9).  Dr. West prescribed Abilify and, on follow-up a month later, noted substantial improvement.  He noted that she was still hearing voices, but less frequently, and had no side effects from the medication.  He told plaintiff's mother that, if the voices continued, he might have to increase plaintiff's dosage but that she had not

---

[5] The alleged onset date in the present application for Title XVI benefits coincides with the protective filing date of August 24, 2006.

been on the present dose long enough to judge her full response to the medication.  Dr. West scheduled plaintiff for a two-month follow-up appointment in December 2004, which plaintiff missed.  (Exhibit 2F).[6]

In October 2005, in connection with plaintiff's previous disability application, psychologist J. Walter Jacobs, Ph.D., performed a consultative psychological evaluation.  Dr. Jacobs noted that plaintiff "has taken no psychiatric medications during the current school year."  Dr. Jacobs administered IQ testing, finding plaintiff's ability to be "average."  He diagnosed ADHD, Combined Type, and Oppositional Defiant Disorder.  He concluded, "This young woman has not taken psychotropic medication during the current school year.  It is felt that she has a good prognosis."  (Exhibit 3F).  On October 28, 2005, after the state agency disability examiner reviewed Dr. Jacobs' assessment, plaintiff's previous application for benefits was denied.  (Exhibit 4F; Exhibit 1A).[7]

On November 17, 2005, a month after Dr. Jacobs' consultative examination, plaintiff and her mother reported to plaintiff's pediatrician, Dr. Adams, that plaintiff had been "having a lot of rage attacks" and hearing voices.[8]  Dr. Adams noted that he had not seen her "in

---

[6] The administrative transcript includes no further treatment records from Dr. West.

[7] According to the Commissioner, plaintiff did not appeal the October 28, 2005 denial of her previous application for benefits.  (Commissioner's brief, p. 1 n. 1).  The appeal presently before the court, as noted above, concerns plaintiff's August 24, 2006 application for benefits.

[8] Dr. Jacobs' report from the previous month does not reference any complaints of hallucinations.  (See Exhibit 3F).

7

about a year" for behavior problems; he further noted that "[s]he is on no medications."[9]  He

and plaintiff's mother discussed referral to Dr. McCleod and Laurel Oaks Behavioral Health

Center for inpatient evaluation.  (Exhibit 7F, R. 236).

Plaintiff was admitted to Laurel Oaks Behavioral Health Center for inpatient treatment

on its Acute Adolescent Unit from December 1 through December 8, 2005, on referral from

the emergency room, after she reported auditory hallucinations.  She reported a "one year

history" of auditory hallucinations telling her to hurt her mother, which occurred only when

her mother told her "to do something."  Plaintiff was evaluated by Mark Pichler, D.O. and

Melanie Cotter, Ph.D.; Dr. Cotter assessed Axis I diagnoses of "Psychotic Disorder, Not

Otherwise Specified (Emerging Thought Disorder)" and Oppositional Defiant Disorder.

Plaintiff was discharged on Seroquel, 100 mg, to be taken at bedtime and with instructions

to follow up with Dr. McCleod for medical management and therapy.  (Exhibit 6F).  A week

and a half later, plaintiff was evaluated by Dr. McCleod. Plaintiff's mother described

behavior problems over the weekend and told Dr. McCleod, "I think she needs to go back

because she still can't deal with her anger."  Plaintiff admitted that she was "mad" because

her mother would not let her "go [Christmas shopping] with [her] Daddy."  She denied any

hallucinations since her earlier discharge, but Dr. McCleod readmitted her to Laurel Oaks

with diagnoses of psychotic disorder, oppositional defiant disorder, obsessive-compulsive

---

[9] On October 25, 2004, Dr. Adams had noted that plaintiff had "[m]uch improved behavior
and grades on Abilify."  (R. 238).

disorder and "rule out" diagnoses of sleep disturbance and sleep apnea.[10]  Plaintiff had been

attending school without any difficulties, but her mother reported that plaintiff's anger had

"just been out-of-control."  On admission, Dr. Pichler indicated that, while plaintiff had not

displayed any aggressive or inappropriate behaviors during her previous admission, and "did

well when she was on our unit just one week ago," she engaged in oppositional behavior at

home.  On December 22, 2005, after three days, plaintiff was discharged with instructions

to take 25 mg of Seroquel each morning, and to continue the 100 mg at bedtime.  Her Axis

I discharge diagnoses were psychotic disorder, not otherwise specified, and oppositional

defiant disorder.  Her prognosis was noted to be "guarded due to compliance with medication

and follow-up with medical management and therapy."  (Exhibit 6F).

On June 16, 2006, plaintiff reported to psychologist Doug McKeown, Ph.D., for a

consultative examination requested by her probation officer.  She had been living with her

father for a few months, but moved back in with her mother after her father was charged with

forcing her to engage in sexual activity with him.  Plaintiff was then taking 50 mg of

Seroquel in the morning and 100 mg at night; she told Dr. McKeown that she was in Laurel

Oaks in December because she was hearing voices and seeing things but that those symptoms

had resolved.  Dr. McKeown conducted intelligence testing and found plaintiff to be at the

low end of the range of borderline intellectual functioning, but he found no indication of a

specific learning dysfunction or attention deficit disorder.  He diagnosed "History of Bipolar

---

[10]  Plaintiff's mother had reported that plaintiff "sleep talks and snores."  (R. 211).

Disorder with Psychotic Features, currently stabilized" and "Adjustment Disorder with Disturbance of Conduct" and "rule out" diagnoses of depressive disorder and victim of sexual abuse.  (Exhibit 8F).

About six months later, on November 30, 2006, plaintiff again reported to Dr. McKeown for a psychological evaluation, this one requested by Disability Determination Services. Dr. McKeown noted plaintiff's psychotic episode in December 2005, but indicated that she had "apparently stabilized."  He recorded plaintiff's report that she was not taking her morning dosage of Seroquel because it made her too sleepy.  Dr. McKeown conducted a mental status examination, noting that "she has been treated for some psychotic symptoms in the past which are not in evidence at the current time and reportedly have not been in evidence since she has been on medication."  Dr. McKeown's diagnostic impressions were "Reported victim of previous sexual abuse suggesting some possible PTSD symptoms," "History of psychotic symptoms, currently stabilized," and "Oppositional Defiant Disorder." He indicated that plaintiffs prognosis was "[f]air, as long as she is compliant with treatment." (Exhibit 11F).

On October 24, 2006, Dr. William Knox assessed plaintiff with "significant conductive hearing loss on both sides, with the right side . . . more affected than the left." He stated, "It appears that [plaintiff] has chronic nasal congestion . . . resulting in a mild conductive hearing loss on the right side and more normal hearing on the left ear."  He recommended tubes, since plaintiff was still in school.  (Exhibit 10F).

Also in October 2006, plaintiff was screened by Dr. Handal for participation in a

clinical trial of anti-psychotic medication.  She reported that her current dosage of Seroquel suppressed hallucinations but made her sleepy.  Plaintiff had a physical and lab tests but was terminated from the clinical trial on November 8, 2006 because she was, for the second time in the month, "out of the screening window for labs and ecg" and her mother had failed to return several telephone calls from the investigators.  (Exhibit 17F).

On June 23, 2008, Dr. Handal[11] completed a form for the Job Corps in Georgia in connection with plaintiff's application for a training program.  He indicated that plaintiff had required treatment for "[r]unning away and hearing voices telling her to kill," but that she had not been "seen by Dr. Handal at this clinic since 2/19/05" [12] and that she was last seen at the clinic on October 24, 2006 for "a study program."  Dr. Handal reported plaintiff's medications "as of 2/19/05" to be Seroquel 100 mg twice daily; he responded "unknown" to questions regarding what medications plaintiff had used in the past year, whether she was compliant, her prognosis, whether she was in an alcohol or drug detoxification program, what she had been doing for the past year, restrictions/limitations, ability to function in a group life setting, tendency for impulsive or suicidal behaviors, and estimated IQ. (Exhibit 16F).

At the administrative hearing on July 24, 2008, plaintiff's mother testified that she took plaintiff out of school because plaintiff was having "so many problems in school," and

---

[11]  The form was addressed to Dr. McCleod but appears to have been signed by Dr. Handel, who practices with Dr. McCleod.  (See Exhibits 16F, 17F).

[12]  This appears to be a transcription error, as plaintiff's only treatment at the clinic, aside from the clinical trial, occurred on "12/19/05," when plaintiff saw Dr. McCleod.  (See R. 306-08; Exhibits 16F, 17F).

that she was trying to get her into the Job Corps for training.  She testified that plaintiff's father was not required to maintain insurance for the plaintiff and that she "can't afford the insurance on [her] job," so she cannot afford plaintiff's medication.  She stated that plaintiff was previously on Medicaid, but it was terminated because plaintiff's mother made too much money.  She testified that she now earns "around $2,500 to $3,000" each month, driving a truck "two or three days out of the week."  She further testified that her income had dropped dramatically because she had to take time off from work to "see about [plaintiff]" and that "the lady" told her to resubmit her application.  She testified that they think that her income is now possibly low enough that she would again qualify for Medicaid; she stated that "[t]hey're still looking at it."  (R. 26-27).

Plaintiff's mother further testified that "[plaintiff] can't function at all well with others in school."  She has "extreme mood swings" and "at one time she said she was hearing voices and they was telling her to do bad things to people."  She stated that plaintiff's problems grew worse as she got older, and that she would have "anger bursts" and try to attack people.  She testified that plaintiff had tried to push her grandmother down the stairs, "[s]o I had to have her – they removed her from my mother's home and put her – we had to put her in a girl's home for a period of six months."  She stated that plaintiff is supposed to be taking Seroquel, but she cannot afford it. (R. 27-28).  When the ALJ asked whether she had tried to get medications through any of the pharmaceutical companies' indigent client lists, plaintiff's mother testified that she had not, and that she was unaware that she could do that.  She testified that her daughter "really can't hear in one ear" and has to read lips.  She

12

stated that plaintiff was held back in first grade and was in special education through seventh grade.  In eighth grade, she was put into regular classes because "[t]hey said she tested out. She didn't need any help."  She has some friends, but not a lot, and does not get along with people in her household.  Her worst problem is that when she gets upset, "she thinks everybody is against her" and she "slams doors, she throws things, she spits, she does all kind of stuff."  (R. 29-31).  Plaintiff's mother testified that "[a]s long as she's on her medicine, she'll be fine."  (R. 33).

Twelve days after the hearing, on August 6, 2008, while plaintiff's family was residing in Macon, Georgia,[13] plaintiff was involved in a physical altercation with her older brother.  Her mother was out of town, and plaintiff called the police.  The police sent plaintiff to the Coliseum Medical Center emergency room after she stated that she would kill herself if she had to stay in the house with her brother.  At the emergency room, plaintiff said that she did not mean it.  (R. 329, 334, 352).  She stated that she had been hospitalized for a week in 2005 "because [she] was hearing things" and, also, that she not taken her Seroquel since 2006.  (R. 329-30).  The triage nurse noted that plaintiff was alone; for "presenting symptoms," she wrote:

> 16 y/o S Blk female - lives [with] mother, 17 y/o Bro + 3 y/o sister
> "I was angry + I said "I'd rather kill myself than stay here"
> "at my house" –
>
> Prev. pt. @ Laurel Oakes – [Dothan] Alabama – Behavior Hospital – "I was

---

[13] See R. 323.  At the time of the hearing, the family was still living in Dothan  (See R. 25, 293).

> there a wk in 05 because I was hearing things" DFACS worker said my
> momma was coming home tonight She is Long Distance Truck Driver + she
> is gone all week.  "I called the police tonight after my Brother Beat me up +
> the Police called DFACS – "I don't want to go back to my house
> "I can't start to school till I get my medication –

(R. 329).  The nurse checked "Yes" on the form to indicate "Suicidal thoughts, threats,

plans, acts, gestures" and "death wishes," writing "see above" to refer to her written intake

note.  (Id.).  She also checked "Yes" to "Attempts, thoughts, threats, plans to harm others,"

writing "Phys. altercations [with] Brother" and to "Behavior which may result in injury –

self/others" and "Physical or Verbal threats of aggression[.]"  (Id.)  The nurse checked boxes

to indicate that plaintiff was "unkempt[,]" "disheveled[,]" and "agitated[,]" that her mood

was "depressed[,]" and her affect "labile." (Id.)  The nurse noted that plaintiff's judgment and

insight were "severely impaired[,]" and that she was "easily distracted."  (Id.).  She further

indicated that plaintiff was oriented "x 3[,]" that her thought processes were coherent, her

associations intact, her thought content "WNL [within normal limits,]" her recent and remote

memory intact, her fund of information average, and that she had good awareness of current

events and past history.  (Id.).  Referring her to the regional hospital for inpatient admission,

the nurse checked "Suicidal ideation (ie. Has identified plan, method or means)[,]"

"Assaultive behavior[,]" and "Psychiatric symptoms severe enough to cause disordered,

bizarre behavior or significant interference with ADL's[.]" (R. 332).

After the DFACS worker reached plaintiff's mother and the ER personnel spoke with

her by telephone to get her consent, the ER staff made arrangements to transfer plaintiff to

Georgia Regional Hospital in Decatur for further treatment.  (Exhibit 18F, R. 325).  The ER

record lists plaintiff's admitting diagnoses as depressive disorder, unspecified, and schizophrenia, not otherwise specified. (R. 322). After plaintiff arrived at Georgia Regional Hospital, she was evaluated by Dr. Whaley, the admitting psychiatrist. Plaintiff told Dr. Whaley that her brother and mother had hit, pushed and kicked plaintiff. She denied suicidal ideation, saying that she had said that she would kill herself only because she was angry. She told Dr. Whaley that she wanted to live with her grandmother in Alabama, but that her mother would not let her do so because she wanted to collect a disability check on the plaintiff. Plaintiff reported that she wanted to go to school but her mother would not allow it. Dr. Whaley assessed an Axis I diagnosis of depressive disorder, not otherwise specified, with a "rule out" diagnosis of major depressive disorder, recurrent, mild. Plaintiff was discharged from the hospital on August 12, 2008, with the same diagnoses, and with instructions to follow-up with an outpatient mental health provider. (Exhibit 19F).

### The ALJ's Findings

The ALJ found that plaintiff suffers from the severe impairments of "receptive and expressive language delay; oppositional defiant disorder; conductive hearing loss; attention deficit/hyperactivity disorder; borderline intellectual functioning; and obesity." (R. 12). However, he concluded that plaintiff does not have an impairment or combinations of impairments which meets, medically equals or functionally equals an impairment in the listings and, therefore, that she has not been disabled since the application date. In reaching his conclusion at the "functional equivalence" step, the ALJ found that plaintiff has no limitation in the domains of "acquiring and using information" and "moving about and

manipulating objects." He concluded that plaintiff has "less than marked" limitations in "attending and completing tasks," "ability to care for herself," and "health and physical well-being." As to the domain of "interacting and relating with others," the ALJ concluded that plaintiff has a marked limitation. (R. 16-20).

### Plaintiff's Contentions

Plaintiff lists the issues as whether the ALJ erred "as a matter of law" by: (1) finding that her impairment or combination of impairments did not "meet or medically equal[]" one of the impairments in the listings; (2) finding that she did not have a severe mental impairment; and (3) finding that she was not disabled. (Plaintiff's brief, p. 4). In the portion of her brief styled "Argument," she advances only one argument – *i.e.* that "the Administrative Law Judge erred in not determining the claimant[']s combinded [sic] mentall [sic] illnesses was a sever [sic] impairment and by doing so totally disregarded the opnions [sic] of the claimant's treating physicians and her immediate family caregivers as well as the evidence of the inpatient facilities and judcial [sic] system." (Id., p. 13).

Plaintiff contends that "the ALJ should have found that she had severe mental impairment. She suffers from Attention Deficit Hyperactivity Disorder, combined type, Schizophrenia, and Oppositional Defiant Disorder." (Plaintiff's brief, p. 12). Contrary to plaintiff's argument, the ALJ *did* find that she suffers from "severe" mental impairments -- *i.e.*, oppositional defiant disorder, ADHD, and borderline intellectual functioning. (R. 12). While plaintiff's argument is far from clear, it appears that she contends that the ALJ erred by failing to find that she is disabled on the basis of psychotic symptoms. To a large extent,

16

plaintiff mischaracterizes the evidence in this regard. She expressly reports some of the evidence inaccurately and, in other instances, singles out portions of the exhibits which – viewed in isolation – paint a different picture than does the exhibit as a whole.  She argues:

> [Dr. McKeown's June 2006 report] found that diagnostically, she demonstrates: 1.) Bipolar Disorder with Psychotic Features; 2.) Depressive Disorder, nos; and 3.)  Adjustment Disorder with Disturbance of Conduct (R. 251-254).
>
> On June 23, 2008, Dr. McCleod completed a Job Corp questionnaire concerning the claimant, in which he documented that she had problems with "hearing voices telling her to kill" and that she was on Seroquel 100 mgs twice daily (R. 290).
>
> Claimant was then admitted to the Coliseum Medical Centers, Macon, Georgia, on August 6, 2008 with a diagnosis of: 1.) Depressive Disorder; and 2.) Schizophrenia, after threatening to commit suicide.  She was then transferred to Georgia Regional Hospital at Atlanta, Decatur, Georgia on August 8, 2008 and discharged on August 12, 2008.

(Plaintiff's brief, p. 10).  Of the three diagnoses plaintiff attributes to Dr. McKeown, she reports only one  – "Adjustment Disorder with Disturbance of Conduct" – accurately.  Dr. McKeown did not diagnose "Bipolar Disorder with Psychotic Features" and "Depressive Disorder NOS," as plaintiff argues – instead, he assessed "*Rule out* Depressive Disorder NOS" and *"History of* Bipolar Disorder with Psychotic Features, *currently stabilized.*"  (R. 252)(emphasis added).  In the same report, Dr. McKeown wrote, "[Plaintiff] reports that she was in Laurel Oaks in December for one week apparently because she was hearing voices and seeing things *which she indicates now have resolved*[,]" and "There is no indication of current hallucinations or delusions but apparently she was recently hospitalized for those

particular symptoms *which she reports are now under control.*"  (R. 250, 251).[14]  Plaintiff's

description of the Job Corps questionnaire is also misleading, this time by omission.  In that

questionnaire, Dr. Handel responded as follows:

> What problem(s) required your care, and what is the current status of each?  <u>Running away and hearing voices telling her to kill.  *Patient has not been seen by Dr. Handal at this clinic since 2/19/2005*</u>

> Medications currently prescribed, and dose? <u>*Past medications as of 2/19/2005*</u>  <u>Seroquel 100 mg twice daily.</u>

(R. 290)(emphasis added).  Dr. Handel professed to no knowledge regarding plaintiff's then-

current or recent mental status, medications, activities or prognosis. (<u>See</u> R. 290-91).  With

regard to plaintiff's August 2008 hospitalization, plaintiff accurately reports the admitting

diagnoses made by the ER physician. (R. 322). While plaintiff relates that she was transferred

to Georgia Regional Hospital on August 8, 2008 and discharged on August 12, 2008, she

fails to mention that, when she was evaluated by a *psychiatrist* at the hospital, her diagnoses

no longer included "Schizophrenia."  Instead, her Axis I diagnosis – both on her admission

to the hospital and on discharge – was depression, not otherwise specified, with a "rule out"

diagnosis of major depressive disorder, recurrent, mild.   (<u>See</u> R. 348, 354).[15]

---

[14]  When Dr. McKeown evaluated plaintiff again, five and a half months later, plaintiff's psychotic symptoms had apparently not re-emerged.  He wrote, "[R]eportedly she has been treated for some psychotic symptoms in the past which are not in evidence at the current time and reportedly have not been in evidence since she has been on medication."  (R. 262).

[15]  Plaintiff also states that ER documentation "reflects that claimant 'lacks mobility for independent daily activity and was at risk for loss of function/deconditioning'."  (Plaintiff's brief, p. 10). "Lacks Mobility for Independent Daily Activity:" and "Patient at Risk for Loss of Function/Deconditioning:" are included on the triage assessment form but there is no indication in the shaded boxes beside those entries – at least none visible in the scanned document in the court

There is evidence of record that, over the years, plaintiff has experienced functional limitations resulting from her mental impairments (including hallucinations), that she required medical treatment for those impairments and that she was admitted as an inpatient for treatment of mental health symptoms in December 2005 and August 2008.[16]  However, there is no indication in the medical records before the court that plaintiff has exhibited symptoms of psychosis since December 2005, eight months before she filed the present application for benefits. As the Commissioner argues, to establish entitlement to SSI benefits, plaintiff had to prove that her impairments were of disabling severity on or after August 20, 2006, the protective filing date of her application. See 20 C.F.R. §§ 416.330, 416.335, 416.501; Bondarenko v. Astrue, 2008 WL 899220, *1 n. 2 (M.D. Fla. Mar. 31, 2008)(citing Casey v. Secretary of Health and Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993)). The ALJ noted that, while he had considered the complete medical history, the relevant period under consideration began on August 24, 2006.  (R. 9).  He further observed that plaintiff had to establish that her disability either had lasted or could be expected to last for a period of twelve continuous months.[17]  He concluded that plaintiff's psychotic disorder had

---

record – to indicate that the ER staff found those conditions to apply to the plaintiff.  (See R. 327).

[16]  Plaintiff's observation that she has "been in and out of mental facilities since 2005" (Plaintiff's brief, p. 13) is technically accurate.

[17]  The Commissioner argues that the record demonstrates that plaintiff's mental condition was well-controlled with medication, and that her noncompliance with prescribed treatment supports the ALJ's finding of nondisability; he contends that plaintiff's mother's testimony that she cannot afford medication plaintiff's medication is not compelling, because she testified that she earns $2,500 to $3,000 each week for part-time work and because she did not seek to qualify for low or no-cost medication.  (Commissioner's brief, pp. 6-8).  While these facts may very well support the

not existed at the "severe" level for the duration period (R. 12).  He further rejected plaintiff's mother's statements regarding the disabling effects of all of plaintiff's impairments, stating, "In terms of 12 months of continuing symptoms at the alleged levels, they are not supported by the office notes of treating sources, the results of consultative examinations, the acknowledged activities of daily living, or the reports of interested third parties."  (R. 15).

The medical record before the court evidences no treatment for mental health issues between plaintiff's last visit with Dr. West in October 2004 and her visit to Dr. Adams over a year later, in mid-November 2005, which was closely followed by plaintiff's two periods of inpatient treatment at Laurel Oaks in December 2005. Dr. Jacobs' report of his consultative psychological examination of the plaintiff in October 2005 references no complaints of psychotic symptoms since plaintiff's treatment by Dr. West, even though plaintiff was not then taking the prescribed Abilify.  When Dr. McKeown evaluated plaintiff in June 2006, six months after her discharge from Laurel Oaks, she reported her treatment at Laurel Oaks due to "hearing voices and seeing things," but indicated that the hallucinations had resolved and were "now under control."  On August 24, 2006, plaintiff protectively filed the present application, starting the relevant period for purposes of the

---

ALJ's findings, the court notes that the ALJ did not rely on plaintiff's noncompliance to support his decision.  Rather, he determined that she had failed to prove that she had disabling functional limitations which satisfied the *duration* requirement of the Act, which requires that during the relevant period, she had "marked and severe functional limitations . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1383c(a)(3)(C)(i).

Commissioner's decision.  In October 2006, plaintiff reported to Dr. Handal three times for physical examinations and laboratory tests for Dr. Handal's clinical trial. At the first screening visit, Dr. Handal indicated that she "is not stable but the medication is helping," and that "the dose she is at now supresses [sic] hallucinations, but makes her very sleepy." (R. 302).  There was no indication in Dr. Handal's notes of the October 2006 clinical trail screening that plaintiff was then experiencing or had recently experienced psychotic symptoms.[18]  In November 2006, when Dr. McKeown conducted his second psychological consultative evaluation, plaintiff's psychotic symptoms were still "not in evidence" and he noted that they "reportedly have not been in evidence since she has been on medication." The record evidences no further medical treatment until plaintiff's hospitalization in Georgia in August 2008 – 31 months after plaintiff was discharged from Laurel Oaks – and, despite the ER physician's diagnosis of schizophrenia and plaintiff's report that she had not taken medication since 2006, the ER record includes no indication that plaintiff was then complaining of or demonstrating psychotic symptoms.

The ALJ found that the plaintiff's impairments – mental and physical – impose functional limitations in four of the six domains, albeit not at a disabling level.  Plaintiff suggests that the ALJ erred by disregarding the opinions of her treating physicians but does

---

[18]  Dr. Handal's response in the Job Corps questionnaire that "Patient has not been seen by Dr. Handal at this clinic since 2/19/2005" indicates that he did not view her participation in the screening for the clinical trial to be medical treatment.  (See R. 290).  He assessed "Schizophrenia NOS - unspecified" on October 16, 2006, but did not include schizophrenia among his assessments on October 2, 2006 or October 24, 2004. (R. 297, 301, 304-05).

not identify the  particular opinions which support her claim of disability.  (Plaintiff's brief, p. 13).[19]  During the relevant period, Dr. Handal saw plaintiff only for the clinical trial, and he expressed no opinion regarding her functional limitations.  Dr. Whaley, the psychiatrist in Georgia, likewise expressed no opinion regarding plaintiff's functional limitations.  No other physician who is arguably a "treating physician"[20] saw plaintiff during the relevant period or expressed an opinion about her functional limitations.   The ALJ indicated that he gave significant weight to the opinions of consultative examiners and to the opinions of non-examining state agency physicians;[21] since these opinions do not contradict the opinions of any "treating physician" regarding the severity of and functional limitations imposed by plaintiff's impairments during the period at issue, the ALJ was entitled to rely on them.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ's findings are supported by substantial evidence and proper application of the law. Accordingly, the decision of the Commissioner is due to be AFFIRMED. A separate judgment will be entered.

---

[19]  Plaintiff accuses the ALJ of "merely picking out random phrases" instead of considering the record as a whole.  (Plaintiff's brief, p. 13).

[20]  The opinion of a one-time examiner, like the ER doctor in Georgia, is not entitled to deference under the Commissioner's regulations pertaining to  "treating physician" opinions. See Crawford v. Commissioner of Social Security, 393 F.3d 1155 (11th Cir. 2004).

[21]  The non-examining state agency medical experts concluded that plaintiff has severe impairments but that they do not meet, medically equal or functionally equal the listings.  (Exhibit 12F).  They completed the form in late 2006, before plaintiff's August 2008 admission, but the ALJ considered this and determined that "the medical records from the period after the form was prepared warrant no other modification in the claimant's ratings." (R. 16).

Done, this 9th day of September, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE